Douglas R. Ricks, OSB 044026
VANDEN BOS & CHAPMAN, LLP
319 SW Washington St., Ste. 520
Portland, OR 97204
Telephone: 503-241-4869
Fax: 503-241-3731

Of Attorneys for Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| In re | Case No. 19-34092-tmb11 |
|---|---|
| Fizz & Bubble, LLC | DECLARATION OF CRAIG BARNES IN SUPPORT OF DEBTOR'S RESPONSE TO UNITED STATES TRUSTEE'S MOTION UNDER 11 U.S.C. § 1112(b) TO DISMISS OR CONVERT |
| Debtor-in-Possession. | |

I, Craig Barnes, declare and state as follows:

1. I am the spouse of the sole member of Fizz & Bubble, LLC and am employed as the chief executive officer for the Debtor-in-Possession, Fizz & Bubble, LLC ("Debtor"), in the above case, and make this Declaration in support of Debtor's Response to the United States Trustee's Motion under 11 U.S.C. § 1112(b) to Dismiss or Convert.

2. Immediately before the filing of the bankruptcy case, the Debtor faced the following creditor and business-related circumstances: (1) default in payments and maturity of the debt owed to the Debtor's single largest creditor (Decathlon Alpha III, L.P. ("Decathlon")); (2) default in rent for both of the Debtor's business locations and a pending lockout from the Debtor's principal headquarters; (3) missed payroll obligations and a substantial loss of employees as a result; (4) substantial outstanding vendor claims without

Page 1 of 4  DECLARATION OF CRAIG BARNES IN SUPPORT OF DEBTOR'S RESPONSE TO UNITED STATES TRUSTEE'S MOTION UNDER 11 U.S.C. § 1112(b) TO DISMISS OR CONVERT

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

Case 19-34092-tmb11    Doc 255    Filed 03/20/20

sufficient cash reserves to pay them; (5) substantial daily withdrawals from a select group of merchant cash advance creditors followed by attempts by such creditors and Decathlon to collect directly on the Debtor's outstanding accounts receivable; and (6) high turnover of the Debtor's financial personnel combined with inaccurate and incomplete books and records and allegations of financial impropriety by said personnel.

3. Attached hereto as **Exhibit A** is copy of a letter of intent that the Debtor received in August 2019. It provides for an acquisition of the company's equity for cash in the amount of $19 million to $21.5 million.

4. The Debtor had a significant orders from major retailers for over $1 million and multiple other orders from national and local retailers and resellers for its products.

5. Notwithstanding the missed payroll, Debtor had a number of its employees return after the filing of the bankruptcy and stand ready to help the Debtor deliver product to customers.

6. The Debtor, as a result of efforts by myself, Kimberly Mitchell, and sales staff, also maintained its connections with its primary buyers and was poised to secure orders from other major retailers to broaden its customer base.

7. Attached hereto as **Exhibit B** is a copy of an amended agreement with Kohl's that relates to Kohl's prepayment of $1.8 million for fulfillment of certain purchase orders.

8. Debtor continued fulfilling purchase orders to Kohl's, due to the size of the orders and the prospect for additional orders in the future.

9. Since the filing, Matthew Wilson and I have engaged Decathlon Alpha III, L.P.'s principal, John Borchers, in numerous discussions about the status of the company's operations to ensure transparency and open communication.

Page 2 of 4    DECLARATION OF CRAIG BARNES IN SUPPORT OF DEBTOR'S
RESPONSE TO UNITED STATES TRUSTEE'S MOTION UNDER 11
U.S.C. § 1112(b) TO DISMISS OR CONVERT

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

Case 19-34092-tmb11    Doc 255    Filed 03/20/20

10. While Decathlon was initially troubled by the Debtor's filing, the communications with Decathlon have helped to re-establish trust in the relationship.

11. From my discussions with Mr. Borchers, Decathlon and the Debtor have discussed a framework for a plan of reorganization that will provide a pathway to confirmation and emergence from chapter 11 bankruptcy.

12. That framework includes a substantial, if not total, conversion of Decathlon's debt for equity in a reorganized Debtor, such that further exit equity financing could be utilized to pay administrative and priority debt and provide a carve-out for payment to general unsecured creditors.

13. In order to assist management, Debtor has brought in a business advisor, Matthew Wilson, who has experience in advising distressed businesses.

14. In addition, the Debtor has taken several cost savings steps such as reducing staff and limiting the product line to operate as efficiently as possible.

15. In January 2020, the Debtor brought in additional accounting help to aid in the financial management of the business.

16. This has allowed the Debtor to assemble projections and updated financial reports to allow the Debtor's selected investment banker to procure an appropriate level of exit financing to supplement income from operations and propose a plan of reorganization.

17. Attached hereto as **Exhibit C** is a copy of a letter of intent from FSW Funding dated February 13, 2020, who would supply the Debtor with additional working capital and a means to address the arrears on payroll taxes and lease payments.

18. Prior to the filing of the Motion, the Debtor was preparing to move forward with seeking court approval for the lending with FSW Funding and securing a closing on a loan.

Page 3 of 4   DECLARATION OF CRAIG BARNES IN SUPPORT OF DEBTOR'S RESPONSE TO UNITED STATES TRUSTEE'S MOTION UNDER 11 U.S.C. § 1112(b) TO DISMISS OR CONVERT

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

Case 19-34092-tmb11    Doc 255    Filed 03/20/20

19. Since the filing of the motion to covert the case from the United States Trustee, FSW Funding had halted further action on securing that lending facility. However, FSW Funding recently tendered a conditional commitment letter to the Debtor, indicating a willingness to move forward with the funding. Attached hereto as **Exhibit D** is a copy of the FSW Funding commitment letter.

20. Based on my communications with the Debtor's retail customers, their personnel have been consumed with complying with federal and state sheltering requirements and social distancing recommendation, which has slowed business as usual operations.

21. The Debtor's enterprise value is directly and largely based on its brand and the quality of its products. This is, in large part, driven by the creativity of the Debtor's founder, Kimberly Mitchell, and the visibility of Debtor's brand.

22. The brand value is key to the overall value of the business as a whole and a major factor for consideration from possible equity and lending partners.

I hereby declare that the above statements are true to the best of my knowledge and belief and that I understand the above statements are made for use as evidence in Court and are subject to penalty for perjury.

Dated: March 20, 2020

/s/ Craig Barnes
Craig Barnes, Declarant

Page 4 of 4    DECLARATION OF CRAIG BARNES IN SUPPORT OF DEBTOR'S RESPONSE TO UNITED STATES TRUSTEE'S MOTION UNDER 11 U.S.C. § 1112(b) TO DISMISS OR CONVERT

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

Case 19-34092-tmb11    Doc 255    Filed 03/20/20



August 19, 2019

Attention: Stewart Williams, Managing Director
121 SW Salmon St #1100
Portland, OR 97204
Confluence Capital Group

Stewart:

We have appreciated the opportunity to review Fizz & Bubble, LLC ("F&B" or the "Company") and are pleased to submit this letter of intent ("LOI") summarizing the valuation and terms under which investment funds advised by Gauge Capital LLC ("Gauge" or "we") would acquire the assets of the Company from Kimberly Mitchell-Barnes (the "Sellers").

We continue to be enthusiastic about the opportunity to partner with Craig and Kimberly for the next chapter of growth for the Company. We enjoyed our discussion with Craig and Kimberly and would look forward to working with them and the rest of the management team to create a post-transaction value creation and growth agenda. We believe the strong working dynamic between our teams has the opportunity to produce tremendous results. We believe that there are numerous opportunities to continue to grow the business, including expanding customer accounts and continuing further door penetration to name a few.

We believe that our investment experiences are relevant to F&B's current and future opportunities and believe that our experience in these and other transactions will enable us to run a streamlined diligence and closing process. In addition to the experience of the Gauge team, we anticipate leveraging the combined experience of our network of advisors and prospective board members, which includes executives with deep experience in beauty and consumer, such as John Golliher, John Heffner, Ron Krassin, and Sara Jones. We look forward to introducing the F&B team to these individuals at the appropriate time in the process.

*LOI Detail*

Based on the information we have reviewed to date, we propose the following terms:

1. <u>Valuation</u>. Based upon our review of the Company and information provided to date, Gauge will value the business at a 6.5x – 7.5x multiple of TTM EBITDA of $3.5m as of June 30, 2019 or ~$23 – $26.5 million (the "<u>Valuation</u>" or "<u>TEV</u>"), subject to accounting diligence. Additionally, our proposal assumes the Company is free of all unrestricted cash, debt, and debt-like items and that, as further described below, the Company has an ordinary-course working capital balance as of the closing of the proposed transaction (the "<u>Closing</u>").

2. <u>Consideration</u>. The Transaction would entail the formation of a new entity ("NewCo") to acquire 100% of the equity of the Company. Consideration would be as follows at a Valuation of $23 – $26.5 million:

    2.1 $19 – $21.5 million in cash, subject to any working capital related adjustment to the Valuation described in Paragraph 1 (the "Cash Purchase Price").

    2.2 Valuation estimates a roll of 30% into NewCo's equity ("Seller Equity Roll").

3. <u>Structure</u>. We are comfortable with our ability to structure the transaction as an equity purchase transaction of the outstanding equity of F&B (subject to completion of customary tax and structuring diligence). Our intention would be for the reinvestment by Kimberly and Craig to be on a tax-deferred basis.

4. <u>Sources and Uses</u>. We would fund the transaction through a combination of third-party debt financing, cash equity capital from Gauge and rollover from the Sellers.

    4.1 <u>Debt</u>. We anticipate the debt portion of the capital structure to be 2.75x the Company's TTM Adjusted EBITDA as of Q2 2019. We have already worked diligently with several lenders to secure financing and believe this leverage level provides for appropriate operational and strategic flexibility but are open to discussing alternative arrangements with the Sellers.

4.2     <u>Equity.</u> Equity for the transaction would be sourced from funds advised by Gauge and via rollover from the Sellers. Gauge would invest in preferred equity interests which would allow for Gauge to receive a 1.0x liquidation preference. After the return of our original capital the Sellers would be entitled to a return of their investment basis (i.e. a "full catch-up" to the Sellers). After the return of capital Gauge and the Sellers would participate pro-rata.

5. <u>Management/Employees</u>. Gauge will seek to support and strengthen the role of the current management team, other key employees of the business and the workforce as a whole. In partnership with Gauge, F&B would remain an independent, stand-alone company and the management team would run the day-to-day operations of the Company while working in collaboration with the Board to set the strategic direction of the Company. To provide more detail on how Gauge interacts with its portfolio companies, we envision our role as providing support to the management team on key strategic initiatives and providing access to our network of resources. We would anticipate each member of our team would individually assist with one to two strategic initiatives at a time and would collectively be in contact with key management team members on a weekly basis. Monthly operating reviews would generally occur over the phone and quarterly Board meetings would be attended in person and would provide for in-depth reviews of the business and opportunities for continued strategic growth.

6. <u>Management Incentives</u>. We have a history of creating equity and equity-like structures for management teams that focus, motivate, and retain. There are a number of ways to structure these incentives and after Closing, we would work closely and cooperatively with the management team to structure and implement an equity incentive plan (*e.g.,* profits interest or an equity-like bonus plan) of up to 10.0% of the fully-diluted equity of the Company to be allocated over time in a measured way targeting high impact and loyal management team members. We would anticipate that each grant would be issued at the then current equity value of the company, subject to employment termination repurchase provisions and customary non-competition, non-solicitation and other similar restrictive covenants. Grants of incentive equity would be subject to customary time and performance vesting criteria to be determined cooperatively by Gauge and the Board.

7. <u>Working Capital:</u> At closing, the Company will be delivered free of indebtedness, income tax obligations, and any other undisclosed/contingent liabilities and have a normalized level of working capital to support the current budget of the Company. Gauge will work with the Seller to determine a target amount of working capital, customarily based on a TTM average approach, which would be subject to a satisfactory review of the historical financials by our accounting advisors. At Closing, the cash portion of the consideration payable to the Seller would be adjusted on a dollar-for-dollar basis to the extent the Company's estimated working capital balance as of the Closing was greater or less than the agreed target amount. At a date subsequent to the Closing, and after the actual working capital as of the Closing has been determined, the purchase price will be adjusted to reconcile any difference between the estimated working capital and actual working capital as of Closing.

8. <u>Governance; Equity Arrangements</u>. Following the Closing, the Company will be governed by a board of managers (the "<u>Board</u>"). The Board would initially consist of one or more members of the selling shareholders as well as representatives of Gauge. We would anticipate working following Closing to identify and recruit long-term value added contributors to serve as additional Board members, such as John Golliher or other seasoned industry executives in our network. The Company will be governed exclusively by the Board and all major strategic, operational and capital markets decisions will be made by the Board, acting by majority vote. Each member of the Board (other than a Gauge representative) will have one vote on all matters, and the Gauge representatives will collectively have a majority of the votes held by all members of the Board. The management team would be free, subject to customary Board oversight, to make all ordinary course, day-to-day operational decisions. We anticipate that Board meetings would be held quarterly. The limited liability company agreement would provide for customary majority control rights in favor of Gauge and customary minority protections in favor of the Sellers.

9. <u>Fees and Expenses</u>. Each party shall bear its own expenses (including, without limitation, all fees and expenses of investment bankers, attorneys, accountants, and other consultants or advisors) in connection with the proposed transaction; provided that (i) at the Closing, NewCo will reimburse Gauge for all of its reasonable out-of-pocket expenses incurred in connection with the proposed transaction; and (ii) if the Sellers or the Company breach the provisions of <u>Paragraph 13</u>, then the Company or the Sellers shall reimburse Gauge for all of the reasonable expenses incurred by Gauge, including the professional time of its employees, in connection with the proposed transaction. At the Closing, Gauge will be entitled to receive a transaction fee equal to 1.0% of the TEV. Such transaction fee shall be paid in cash by NewCo at the Closing. Following the Closing, Gauge will also be entitled to receive an annual monitoring fee from NewCo in the amount of 4.0% of the annual budgeted EBITDA of the Company, payable quarterly in advance at the beginning of each quarter.

10. <u>Material Conditions and Assumptions</u>: Gauge's proposal is subject to, among other things, the following conditions and assumptions: (a) negotiation of satisfactory definitive documentation consistent with the provisions of this LOI; (b) completion of all confirmatory due diligence in a manner satisfactory to Gauge (see below for additional detail); (c) receipt of all third-party and governmental consents and approvals necessary for the transaction; and (d) there having been no material adverse change to the Company's business, assets, financial condition or prospects since the date of the last financial statements provided to Gauge.

11. <u>Remaining Diligence Requirements.</u>  We anticipate conducting a thorough due diligence process focused on key areas customary to transactions of this type, including: confirmatory business due diligence (e.g. customer calls/survey, third-party market validation), accounting due diligence (e.g. quality of earnings and tax analysis), legal and regulatory due diligence, insurance due diligence, background checks, and IT assessments.

12. <u>Timing and Approval Process</u>.  Gauge does not require approval from a corporate sponsor or limited partners. The approval of our Investment Committee will be required before the Closing; we have had fulsome discussions regarding this proposal with our Investment Committee. We estimate that, after agreeing to this exclusive LOI, we would need approximately 90 days to complete confirmatory diligence and consummate the transaction.  We anticipate working cooperatively with the Company and the Sellers during that period to secure any necessary governmental or third-party approvals.

13. <u>Exclusivity Period</u>. The Company and the Seller's agree that for 90 days from the date of execution of this document (the "<u>Exclusivity Period</u>"), the Company and the Seller's will not, and will cause their respective affiliates and representatives to not, directly or indirectly, enter into negotiations or hold any discussions with, or enter into any agreement with, any person or entity regarding a possible merger, sale or other disposition, financing, or recapitalization of all or any part of the Company or any of its assets (other than sales of assets in the ordinary course of business, consistent with past practices).  The Exclusivity Period will automatically renew for one 15 day period so long as, as of the end of the initial 90-day Exclusivity Period, Gauge is diligently pursuing the Transaction at the end of the then current period and reaffirms to the Company that it intends to continue pursuing the Transaction subject to and on the terms set forth herein. Furthermore, the Exclusivity Period can be extended upon mutual agreement by Gauge and the Seller. Notwithstanding the foregoing, this <u>Paragraph 13</u> shall terminate at the election of the Company if Gauge notifies the Company that it no longer desires to proceed with the Transaction on terms which are, in all material respects, at least as favorable to the Company as those set forth in this LOI.  The Company and the Sellers agree and acknowledge that legal damages for a breach of this <u>Paragraph 13</u> would be difficult or impossible to determine and that Gauge shall be entitled to injunctive relief (without the requirement to post any bond in connection therewith) for any such breach, in addition to any other remedies to which it may be entitled at law or in equity.

14. <u>Public Announcements</u>. The parties agree not to make any public announcements regarding the transaction without the written consent of the other party, except to the extent such disclosure is legally required.

15. <u>References</u>.  Upon signing this LOI, we would be happy to provide a fulsome list of references.  These references are made up of current and former CEOs, colleagues and investors who have substantial experience working with the individuals at Gauge.

16. <u>Binding Effect</u>.  This LOI is intended only as a statement of the present intent of the parties hereto and shall not, except as set forth otherwise herein, give rise to any binding obligation of any kind.  No binding obligation to engage in a transaction will exist unless and until all necessary approvals have been obtained and the parties have negotiated, approved, executed and delivered the appropriate mutually acceptable definitive documents.  Notwithstanding the foregoing, the provisions of <u>Paragraphs 13</u>, <u>14</u>, and this Paragraph <u>16</u>, shall be binding on the parties hereto and shall be enforceable against them in accordance with their terms.

We hope that this offer is attractive to the shareholders of F&B. They can be assured of Gauge's ability to complete the proposed transaction. We sincerely look forward to a partnership with the Company and the ability to work with the management team in realizing their vision for the Company.

Respectfully,

Drew Johnson
Co-Founder and Managing Partner
(682) 334-5801
djohnson@gaugecapital.com

James Jackson
Principal
(682) 334-5783
jjackson@gaugecapital.com

Alex Saldana
Associate
(682) 651-4020
asaldana@gaugecapital.com


ACCEPTED as of _____, 2019

Fizz & Bubble, LLC

By: _____

Its: _____



August 26, 2019

**VIA EMAIL**
Craig Barnes
Fizz & Bubble, LLC
27120 SW 95th, Suite 3280
Wilsonville, OR 97070

Re: *AMENDMENT – Kohl's and Fizz & Bubble – Prepayment Agreement*

**Dear Craig:**

Reference is made to agreement between **Kohl's Department Stores, Inc.** ("**Kohl's**") and **Fizz & Bubble, LLC** ("**F&B**"), effective May 1, 2019, regarding Kohl's advanced payment to F&B, in the amounts and according to the terms specified therein, in connection with Kohl's purchase of certain merchandise from F&B ("**Agreement**"). The Parties desire to amend the Agreement on the terms and subject to the conditions set forth in this letter ("**Amendment**"), effective August 26, 2019 ("**Amendment Effective Date**"). Please have a copy of this Amendment signed and returned to me (via PDF/email) to confirm our understanding, as follows:

1. **Definitions**: Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Agreement.

2. **Term:** The Term of the Agreement shall be amended such that it shall expire upon the earlier of: (i) the total Prepayment amount paid by Kohl's to F&B reaches One Million Eight Hundred Thousand Dollars ($1,800,000.00); (ii) October 31, 2019; or (iii) contemporaneous with F&B's fulfillment of Kohl's final purchase order for F&B merchandise ("**Term**"). Upon expiration or termination of the Agreement, Kohl's shall have no further Prepayment obligations to F&B in connection with any subsequent purchase orders; however, F&B's repayment obligations and Kohl's rights and remedies in connection therewith shall expressly survive in accordance with Paragraph 10 of the Agreement.

3. **Acknowledgement**: For the avoidance of doubt, the Parties acknowledge and agree that, as of the Amendment Effective Date, Kohl's has not exercised any applicable deductions or discounts relative to the Prepayment amounts nor has F&B repaid to Kohl's any of the Prepayment amounts, as set forth in the Agreement. Any increased Prepayment amounts set forth in this Amendment constitute the total sum of the Prepayment that may exist between the Parties and is not in addition to any amounts originally provided in the Agreement.

4. **Limited Effect**: The Parties further acknowledge and agree that the Agreement (and any amendments, exhibits, or schedules thereto), including, without limitation, any Prepayment terms provided for therein, shall not apply to Kohl's purchase of any cannabidiol products from F&B. Kohl's purchase of such products shall instead be governed by the Purchase Order, Other Terms, and any separate agreement as entered into by the Parties.

5. **Payment Deduction**: In consideration for the Prepayment, Kohl's shall be entitled to deduct, via set-off, fifty percent (50%) of all invoiced amounts from F&B during the Term ("**Payment Deduction**") until the Prepayment amount is recouped in full by Kohl's.

6. **Repayment Amounts**: If, by October 31, 2019, Kohl's has not fully recouped the total Prepayment amount through Payment Deductions, as evidenced by Kohl's records and provided to F&B upon request, F&B shall pay to Kohl's the difference between the total Prepayment amount and all such Payment Deductions applied by Kohl's as of October 31, 2019 ("**Repayment Amounts**") via wire transfer or issued check, no later than November 4, 2019. F&B's failure to pay the Repayment Amounts shall constitute a breach of the Agreement and entitle Kohl's to withhold any and all future payment obligations to F&B until such Repayment Amounts are paid in full.

7. **Effect of Amendment**: This Amendment is effective as of the Amendment Effective Date and is hereby incorporated into and made part of the Agreement. Except as amended by this Amendment, all terms and provisions of the Agreement shall continue and remain in full force and effect and binding upon the parties thereto.

In the event of any conflict between the operative governing documents, the order of precedence will be (i) the Purchase Order; (ii) Other Terms; (iii) this Amendment; and (iv) the Agreement. Such documents constitute the entire agreement between the Parties with respect to the subject matter referenced therein and supersede all prior agreements, written or oral, with respect to such subject matter.

8. **Counterparts**: This Amendment may be executed in counterparts, each of which is deemed an original, but all of which constitutes one and the same agreement. Delivery of an executed counterpart of this Amendment electronically shall be effective as delivery of an original executed counterpart of this Amendment.

9. **Headings**: The headings in the Agreement and this Amendment are for reference only and do not affect the interpretation thereof.

Please do not hesitate to reach out if you have any questions or concerns with the foregoing or otherwise.

**Very truly yours,**

**Amy Kocourek**
EVP/GMM-Jrs/Kids/Acces/Jewlery
Kohl's Department Stores, Inc.

**ACCEPTED AND AGREED TO:**

FIZZ & BUBBLE, LLC

By: _____
   CRAIG BARNES
   CEO

2


4530 East Shea Blvd., Ste. 142
Phoenix, AZ, 85028
Phone: 480.440.2496
Email: akeck@fswfunding.com
www.fswfunding.com

**SENT VIA ELECTRONIC MAIL**

February 13, 2020

Mr. Craig Barnes
Ms. Kimberly Mitchell
Fizz & Bubble, LLC (DIP)
27120 SW 95th, Suite 3280
Wilsonville, OR 97070

    **Re: Proposal for Accounts Receivable Financing with FSW Funding**

Dear Randy,

Thank you for considering FSW Funding for your financing needs. Based on our initial due diligence, we're pleased to present to you this proposal for financing.

The proposed terms are as follows:

| | |
|---|---|
| **Prospect Name:** | Fizz & Bubble, LLC |
| **Maximum Credit Facility:** | Seven Hundred Fifty Thousand ($750,000) |
| **Advance Rate:** | Eighty percent (80%) of eligible accounts receivable, or Maximum Credit Facility, whichever is less |
| **Initial Term:** | 24 months from the effective date of the Factoring and Security Agreement |
| **Renewal Term:** | 12 months from the end of the Initial Term, unless thirty (30) days' notice to terminate is received |
| **Fees and Interest:** | Factoring Fee of 1.00% for the first thirty (30) days that each financed invoice remains outstanding, based on the face amount of each financed invoice. Interest will be charged monthly on the average daily outstanding balance at the annual rate of Six and One-Half Percent (6.50%) above the Prime Rate (as published in the Wall Street Journal's "Bonds, Rates & Yields" table) with the Prime Rate never being lower than its current rate of Four and Seventy-Five hundreths Percent (4.75%). |
| **Facility Fee:** | Waived |
| **Monthly Minimum Fee:** | Waived |



4530 East Shea Blvd., Ste. 142
Phoenix, AZ, 85028
Phone: 480.440.2496
Email: akeck@fswfunding.com
www.fswfunding.com

| | |
|---|---|
| **Non-Refundable Due-Diligence Fee:** | Five thousand dollars ($5,000), payable upon the acceptance of this proposal. |
| **Additional Fee(s):** | Wire Transfer Fee $30.00, ACH Fee $5.00 |
| **Security/Collateral:** | FSW Funding requires a court approved "super-priority lien" security interest in all assets and a first priority UCC-1 filing on accounts receivable and proceeds. Lien terminations and or subordinations will be required from all secured parties with liens filed against accounts receivable and proceeds. |
| **Guarantee(s):** | Personal guaranties on all shareholders of 20% or greater as well as subsidiaries or affiliated companies. |
| **Collection Clearance:** | Three (3) business days. Clearance is defined as the number of days it takes the paying bank to clear a check. |

It should be understood that this is not a commitment on the part of FSW Funding, but merely a proposal. It should also be understood while the details of this proposal have been reviewed by senior management of FSW Funding, it is subject to the completion of due diligence and preparation and execution of legal documentation fully acceptable to FSW Funding. Furthermore, you agree to reimburse FSW Funding for all fees, costs, and expenses in the completion of said due diligence and preparation of legal documentation that exceed the Non-Refundable Due-Diligence Fee.

I want to thank you again for considering FSW Funding. Please feel free to call me if you have any questions.

Sincerely,
FSW Funding

Agreed and Accepted:
Fizz & Bubble, LLC
Mr. Craig Barnes (or)
Ms. Kimberly Mitchell

*Adam Keck*

_____
Adam Keck
Vice President

Sign: *[signature]*
Date: February 14, 2020
Print: Craig Barnes
Title: CEO



4530 East Shea Blvd., Ste. 170
Phoenix, AZ, 85028
Phone: 602.535.5984
www.fswfunding.com

## Conditional Commitment

March 19, 2020

Mr. Craig Barnes
Ms. Kimberly Mitchell Fizz & Bubble, LLC (DIP) 27120 SW 95th, Suite 3280
Wilsonville, OR 97070

Re: Proposal for Accounts Receivable Financing with FSW Funding

Dear Craig & Kimberly,

    Thank you for granting FSW Funding (**"Lender"**) the opportunity to present a financing proposal to Fizz & Bubble, LLC (DIP) (**"Borrower"**). We are pleased to inform you that, based upon the information presently available to Lender and subject to satisfactory results of Lender's due diligence and final approval, the Lender would be prepared to propose the following financing upon the general terms and conditions set forth herein (the **"Credit Facility"**).

    **This Conditional Commitment from Lender is contingent upon satisfactory results of Lender's due diligence, satisfactory outcome in BK court proceedings, and final approval by Lender. Should you wish to pursue financing pursuant to this proposal, satisfactory results of additional due diligence will be needed to permit final approval by Lender, as well as complete legal documentation (on forms acceptable to Lender in its sole discretion). This Conditional Commitment and any implied offer to finance may be revoked or rescinded by Lender at any time.**

The proposed terms are as follows:

| | |
|---|---|
| **Prospect Name:** | Fizz & Bubble, LLC (DIP) |
| **Maximum Credit Facility:** | Seven Hundred Fifty Thousand ($750,000) |
| **Advance Rate:** | Eighty percent (80%) of eligible accounts receivable, or Maximum Credit Facility, whichever is less |
| **Initial Term:** | 24 months from the effective date of the Factoring and Security Agreement |
| **Renewal Term:** | 12 months from the end of the Initial Term, unless thirty (30) days' notice to terminate is received |
| **Fees and Interest:** | Factoring Fee of 1.00% for the first thirty (30) days that each financed invoice remains outstanding, based on the face amount of each financed invoice. Interest will be charged monthly on the average daily outstanding balance at the annual rate of Six and One-Half Percent (6.50%) above the Prime Rate (as published in the Wall Street Journal's "Bonds, Rates & Yields" table) with the Prime Rate never being lower than its current rate of Four and Seventy-Five hundredths Percent (4.75%). |
| **Facility Fee:** | Waived |



4530 East Shea Blvd., Ste. 170
Phoenix, AZ, 85028
Phone: 602.535.5984
www.fswfunding.com

| | |
|---|---|
| **Monthly Minimum Fee:** | Waived |
| **Additional Fee(s):** | Wire Transfer Fee $30.00, ACH Fee $5.00 |
| **Security/Collateral:** | FSW Funding requires a court approved "super-priority lien" security interest in all assets and a first priority UCC-1 filing on accounts receivable and proceeds. Lien terminations and or subordinations will be required from all secured parties with liens filed against accounts receivable and proceeds. |
| **Guarantee(s):** | Personal guaranties on all shareholders of 20% or greater as well as subsidiaries or affiliated companies. |
| **Collection Clearance:** | Three (3) business days. Clearance is defined as the number of days it takes the paying bank to clear a check. |

These terms and conditions are subject to change. Please note that this proposal does not contain all of the terms, conditions and other provisions involved in this transaction that would be more fully described in the definitive legal document(s) for the proposed transaction. Furthermore, the Lender reserves the right to withdraw this proposal at any time.

If you have any questions, please call me at 602-535-5984.

Sincerely,

FSW Funding

*Robyn Barrett*

By: Robyn Barrett
Title: Managing Member

In re Fizz & Bubble, LLC
Bankruptcy Case No. 19-34092-tmb11

# CERTIFICATE - TRUE COPY

DATE: March 20, 2020

DOCUMENT: DECLARATION OF CRAIG BARNES IN SUPPORT OF DEBTOR'S RESPONSE TO UNITED STATES TRUSTEE'S MOTION UNDER 11 U.S.C. § 1112(B) TO DISMISS OR CONVERT

I hereby certify that I prepared the foregoing copy of the foregoing and have carefully compared the same with the original thereof and the foregoing is a correct copy therefrom and of the whole thereof.

# CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing on:

Fizz & Bubble, LLC
Attn: Kimberly A. Mitchell
27120 SW 95th Ave., Ste. 3280
Wilsonville, OR 97070

Oswego Financial Services
Attn: Glenn J. Smith
4091 Coltsfoot Lane
Lake Oswego, OR 97035

Mike Vanier
7650 Beveland Street, Suite 170
Portland, Oregon 97223

Lloyd R. DuBois
0932 SW Palatine Hill Rd.
Portland, Oregon 97219

Express Employment Professionals
Wayne Marschall
7401 SW Washo Court, Suite 200
Tualatin, Oregon 97062

Bruce Wood
510 SW 5th Ave., Suite 300
Portland, Oregon 97204

Diane M. Humke
32272 Apple Valley Rd
Scappoose, OR 97056

by mailing a copy of the above-named document to each of the above in a sealed envelope addressed to the last known address. Each envelope was deposited into the postal system at Portland, Oregon, on the below date, postage prepaid.

I hereby certify that the foregoing was served on all CM/ECF participants through the Court's Case Management/Electronic Case File system on the date set forth below.

Dated: March 20, 2020        VANDEN BOS & CHAPMAN, LLP


By:/s/Douglas R. Ricks
   Douglas R. Ricks, OSB 044026
   Of Attorneys for Debtor-in-Possession